# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL ACTION NO. 6:17-CR-25-S-REW

UNITED STATES OF AMERICA                                                                    PLAINTIFF

V.                        **AFFIDAVIT OF JOHN L. CAUDILL**

ANWAR MITHAVAYANI                                                                           DEFENDANT

\* \* \* \* \*

Comes now the Affiant, John L. Caudill, former counsel to the Defendant, Anwar Mithavayani, and declare as follows under penalty of perjury:

1. I was retained to represent Anwar Mithavayani in the criminal action number 6:17-CR-25 in the Eastern District of Kentucky.

2. I have reviewed the Motion to Vacate Conviction filed by Mithavayani at docket entry 693 (with accompanying affidavit at docket entry 693-1) and the supporting Memorandum of Law at docket entry 706.

3. Mithavayani has made various allegations with respect to his claims of ineffective assistance of counsel. I address those allegations herein.

4. I made strategic decisions in conducting the cross-examinations of witnesses Jenna Crawley, Amanda Boyd, Julie Hankins, and Mary Katherine Bratton. I focused the cross-examinations on issues I believed to be most pertinent to creating reasonable doubt in the minds of the jurors as to Mithavayani's guilt on the drug conspiracy and money laundering charges. The issues Mithavayani claims that should have been

addressed in cross-examination are, even with the benefit of hindsight, tangential to the defense case.

    a. As to Crawley, I elicited favorable testimony from her, including but not limited to: (1) her involvement with Pete Tyndale and his instruction to use the name "Sam" while accompanying him to the new pain clinic he was establishing in Tennessee and her use of that name in an email account; (2) that Mithavayani had no involvement in the Jacksonville pill mill operations or with Faye Imaging (Pete Tyndale's MRI business); (3) aspects of the illegal pill mill operations in Jacksonville that were not present at Tennessee Pain Institute ("TPI"); (4) that she never told Mithavayani about any of her involvement in criminal activity regarding the Jacksonville operations or that she was under federal investigation; and (5) that she does not know of anything Mithavayani did that was illegal. Choosing to recall Crawley to the stand a second time would have risked giving the United States an opportunity to rehabilitate the witness and undermine the effectiveness of the cross-examination. I made the strategic choice not to take that risk.

    b. As to TPI employee Julie Hankins, I elicited favorable testimony from her, including but not limited to: (1) contrary (and more favorable) testimony she previously gave in the grand jury about how TPI handled complaints about patients; (2) that TPI discharged hundreds of patients and made referrals to law enforcement; (3) Mithavayani was not involved in medical decisions; (4) Mithavayani, unlike co-defendant Tyndale, never instructed

  Hankins to not tell the truth; (5) she and the TPI staff did not feel like they were part of anything criminal; (6) that TPI patients needed medical care; (7) Mithavayani wanted things done correctly and professionally at TPI; and (8) Hankins had no information that anyone at TPI knew that Dr. Rodenberg was under criminal investigation when he was offered a job at TPI. I believed that all of these topics were significantly more important to the defense than any line of questioning regarding Jenna Crawley and that addressing additional topics would have lessened the effectiveness of the cross-examination by distracting the jury from the significant points I raised with the witness. This was particularly important in a multi-defendant trial where other defense attorneys cross-examined the same witness.

c. As to TPI employee Amanda Boyd, I elicited favorable testimony from her, including but not limited to: (1) Mithavayani was not involved in medical decisions; (2) Mithavayani gave staff updates about the laws governing pain clinics and visited TPI to make sure staff was doing things legally; (3) that TPI used a screening process for admitting patients; (4) introduction of an audio recording of a call in which Boyd employed the screening questions for admitting a new patient; and (5) she and Hankins were diligent about making sure the wrong people did not get into TPI. Again, addressing these important topics and not wasting time and juror attention on questioning regarding Jenna Crawley was a sound strategic choice I made.

3

    d. As to Mary Katherine Bratton of the Tennessee Department of Health, Office of General Counsel, my cross-examination followed extensive cross-examination by attorneys for Gary Moore and Timothy Gowder. I elicited additional favorable testimony from her, including but not limited to: (1) standards and regulations regarding pain management and the prescribing of controlled substances had evolved over time (particularly during the relevant period of the charged drug conspiracy); (2) that the Tennessee Medical Board allowed Moore and Gowder to continue practicing during the Board's investigation and even for a limited period after those investigations resolved via agreed orders; and (3) Tennessee only recently required that the medical director of a pain clinic have board certification in pain management. I did not elicit the specific testimony referenced in Mithavayani's § 2255 Motion about Gowder and Moore testifying that they developed the patient policies at TPI because other witnesses testified that Mithavayani was not responsible for the medical policies or decisions at TPI, and this was not a salient point to cover with Bratton. I made the strategic decision to cover specific topics with Bratton, particularly in light of the other attorneys' cross-examinations of the witness.

5. I carefully considered whether to put forth an "advice of counsel" defense. Asserting this defense would have required testimony from Mithavayani or Edward Hadley (counsel to Health Care Managers, the company owned by Mithavayani and Pete Tyndale for the purpose of operating TPI), or both. This prospect carried significant risks, and

4

Mithavayani elected not to testify at trial, which was ultimately his decision to make. As to Hadley, I had significant concern that Hadley would invoke his Fifth Amendment rights if questioned at trial, and this would have created very damaging jury optics for Mithavayani. Given that the advice-of-counsel defense requires showing that a full disclosure of all pertinent facts was made to the counsel giving advice, I was also concerned that calling Hadley would allow the United States to cross-examine him on myriad unfavorable aspects of TPI's practices that likely were not disclosed to Hadley at the time he was advising Mithavayani and Tyndale.

6. I did not believe then, nor do I believe now, that calling Justin Wood of the Drug Enforcement Administration or Brian Reeder of the Kentucky State Police would have been a sound decision. The potential helpful information either of these witnesses could have provided is speculative and negligible, and calling such plainly adverse witnesses is fraught with risk. I also note that Mithavayani implies that Reeder could have been called to give testimony that "none of the TPI employees nor any business partners knew of anything 'improper' by Mr. Mithavayani." This is plainly inadmissible hearsay. Furthermore, I elicited this point firsthand from my cross-examination of Julie Hankins.

7. I weighed the benefits and risks of calling as a defense witness Dr. John Blakely, a physician who also worked at TPI after previously losing his privilege to practice as an anesthesiologist. Although there were some potential helpful points he may have offered, his prior statement to law enforcement contained damaging assertions as well, including: his concern that Gowder was co-prescribing opioids and benzodiazepine-class drugs, which was known to be dangerous and contrary to medical standards; that Gowder performed practically no examinations on patients; he was told by a TPI office manager

5

that patients were paying a lot of money and he needed to prescribe more medication; that he was called an "asshole" for trying to reduce dosages; that TPI practices regarding who could be in the waiting room and that patients could not talk to each other were suspicious; and that Tyndale was the "enforcer" at TPI and projected an image that Tyndale was dangerous—so much so that Blakely wrote a letter documenting incidents that had occurred at TPI and left copies of the letter around his residence "in case something happened to him." I made a tactical decision not to call Blakely as a witness.

8. Mithavayani alleges that I failed to investigate the relevant relationships and roles of "Tyndale, Rose, Crawley, and Hadley." This is not true. "Rose" refers to Zach Rose, who was operating pill mills in Jacksonville with the help of Crawley and Tyndale. As noted above, my strategy was to show the jury that Mithavayani had nothing to do with that illicit operation in Jacksonville and that TPI operated very differently. I accomplished that through my cross-examination of Jenna Crawley. As for Hadley, I well understood his relevance to the case but, as explained above, made the strategic decision not to call him as a witness.

9. I discussed a potential plea with Mithavayani, but he adamantly refused to consider pleading guilty. I advised him about the potential for providing the government with substantial assistance and how that could reduce his sentence. I did not advise him to plead guilty, but he was aware that a guilty plea was an option. He expressed no interest in resolving the case in that manner.

10. Mithavayani's Memorandum of Law – but not Ground Three of his § 2255 motion – references my "fail[ure] to investigate the available factual basis upon which the testimony of Dr. Eason and general counsel Mary Bratton were based." I have already

6

discussed my cross-examination of Bratton above. As for Dr. Eason, my cross-examination demonstrates I had diligently prepared for that witness and I elicited favorable testimony from him on various topics, including but not limited to: (1) that someone operating in an administrative capacity, like Mithavayani, cannot be expected to know about the scope of professional practice in a pain clinic or what doses are appropriate to prescribe; (2) that Dr. Eason did not know that scores of TPI patients were discharged from the clinic for failing pill counts; (3) that Dr. Eason reviewed only a small subset of the total patient files from TPI; (4) that guidelines to pain clinicians for morphine equivalent dosages did not exist in 2011 and 2012, when TPI was first operating; (5) that overprescribing pain medication is not necessarily a criminal act; and (6) that other doctors overprescribed opioids to patients who later received the same dosages at TPI. My review of the "data" – i.e., TPI electronic medical records – that Mithavayani references in his Memorandum of Law revealed that the data was not reliable and thus not a viable source for cross-examining Dr. Eason, and in any event my cross-examination achieved the points I believed were important for the defense strategy. Further affiant sayeth not.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 18, 2022.

_____
John L. Caudill